IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUAN DAVILA-BAJANA,
    PLAINTIFF

Civil Action No. 04-253E

v.

Judge McLaughlin
Magistrate Judge Baxter

TIM HOLOHAN, ET AL.,
    DEFENDANTS

DECLARATION OF MARTIN SAPKO, FACTORY MANAGER

1. I am the Factory Manager of the Federal Prisons Industries, Inc. (FPI or trade name UNICOR) factory at the Federal Correctional Institution (FCI) in McKean, Pennsylvania. I have been employed in this capacity since approximately February 27, 2000. As the Factory Manager at FCI McKean, I oversee and direct the operations of the UNICOR furniture factory at FCI McKean.

2. As the Factory Manager at FCI McKean, my responsibilities include oversight of all facets of the factory operation. This includes, among other areas: production, staff conduct, and inmates conduct and discipline. Additionally, I am responsible for the ensuring the safety and secure operation of the factory.

3. I am aware that inmate Juan Davila-Bajana, Register Number

47580-053, filed a civil rights action, in which he alleges that I retaliated against him by removing him from his UNICOR work assignment after he allegedly complained about the quality of the air in the UNICOR factory.

4. FPI is a wholly-owned government corporation, created by Congress in 1934 with the mission of providing work simulation programs and training opportunities for inmates confined in federal correctional facilities. In order to achieve this goal, FPI operates factories in over 100 locations across the country. It manufactures products and services in seven different business groups: Electronics, Clothing & Textiles, Fleet Management & Vehicular Components, Services, Office Furniture, Recycling, and Industrial Products.

5. Typically, each prison (with the exception of minimum security and administrative/pretrial facilities) in the Federal system contains one UNICOR factory which is a division of one of the above referenced business groups. At all times relevant to this case, the factory at FCI McKean was part of the Office Furniture Business Group. The factory has since changed missions, and now manufactures plastic products. It is UNICOR's goal to employ a minimum of 25% of all eligible inmates incarcerated in the federal

system.

6. Decisions relating to the hiring and removal of inmates from FPI work assignments are governed by BOP Program Statement 8120.02, FPI Work Programs for Inmates. **Attachment A is a true and correct copy of Program Statement 8120.02, FPI Work Programs for Inmates.**

7. Records reflect inmate Davila-Bajana is a Federal inmate currently serving a 20 year sentence for Conspiracy to Distribute Cocaine and Heroin, in violation of Title 21 U.S.C. §§ 841 and 846. His projected release date is November 11, 2016, via Good Conduct Time release, at which time he will be subject to a deportation detainer. **Attachment B is a true and correct copy of inmate Davila-Bajana's Sentence Monitoring Computation Data.**

8. Inmate Davila-Bajana initially arrived at FCI McKean on or around April 1, 1998. He was briefly assigned to UNICOR in 1999 before he was removed to another institution pursuant to a Federal Writ on January 7, 2000. He returned to FCI McKean on or around February 8, 2000. That same day, he was re-assigned to work in the UNICOR factory as a shophand in the Dayshift production work assignment, training to be a materials coordinator. **Attachment C is a true and correct**

copy of inmate Davila-Bajana's inmate history data. **Attachment D is a true and correct copy of inmate Davila-Bajana's inmate work history.**

9. In March 2000, he was moved from the training position to a position as a materials coordinator on the day shift. As a materials coordinator, he would have been responsible for receiving materials from the warehouse. He remained in that position until June 2000, when he was temporarily removed and housed in the Special Housing Unit (SHU). I have no personal recollection as to the reason he was sent to SHU at that time. **See Attachments C and D.**

10. He returned to his UNICOR work assignment in July of that year, as a production clerk. At that time, his responsibilities would have included maintaining records and other paperwork pertaining to shipments of materials from the warehouse to the factory. **See Attachments C and D.**

11. Inmate Davila-Bajana remained in that position until March 2002. At that time, he was removed from his factory work assignment as a result of a foreman finding small discs of sandpaper in his possession. Sandpaper is a well known weapon making material. **See Attachment D. Attachment E is**

a true and correct copy of inmate Davila-Bajana's Disciplinary Record.

12. Inmate Davila-Bajana returned to his UNICOR work assignment on or around August 1, 2002. At that time, he was assigned as a production coordinator, distributing raw materials to the layup line or panel saw area. **See Attachment D.**

13. Inmate Davila-Bajana was then moved to a materials coordinator position, working in the cold press area. This is where inmates glue laminate to the particle board and glue hardboard to Micore Board. No cutting or sawing is performed in this area. He was subsequently promoted to a Grade 3, and ultimately to a Grade 2. He remained in that position until March 2003. **See Attachment D.**

14. Inmate Davila-Bajana was subsequently removed from the factory on or around March 31, 2003. I was not personally involved in the decision to remove inmate Davila-Bajana from the factory, I did not discuss it with him or anyone else, at that time.

15. I next spoke with inmate Davila-Bajana in April 2003, after he filed a Request for an Administrative Remedy. In that request, he alleged that he was removed from UNICOR because

of his concerns with the air quality. This was the first time I ever heard such a complaint from him.

16. The Business Manager and I met with inmate Davila-Bajana, along with the institution's Executive Assistant, to discuss his request. At that time, we explained to him that the reason for his removal was not based upon any concerns he may have raised.

17. Inmate Davila-Bajana was further instructed that if he wanted to be reassigned to his UNICOR work assignment, he would have to discuss the matter with the Superintendent of Industries. I have no personal knowledge as to whether inmate Davila-Bajana actually spoke with the Superintendent of Industries at that time. I do know, however, that he did not return to his UNICOR work assignment.

18. At no time did I ever promise inmate Davila-Bajana that I would return him to a work assignment in UNICOR. Particularly, I never told him that I would do so in exchange for withdrawing his Request for Administrative Remedy. The decision to withdraw his administrative remedy was strictly a voluntary decision, made by inmate Davila-Bajana, following our meeting to discuss the reasons for his removal from the factory.

19. As the Factory Manager, I did not have regular daily interaction with many of the inmates assigned to UNICOR. If any inmate had a significant complaint, however, I was always made aware of it either by the inmate or by another staff member who had spoken with the inmate. To the best of my recollection, inmate Davila-Bajana never complained to me about the quality of the air in UNICOR, environmental tobacco smoke, silica dust in the factory, or any other issue, at any time prior to his removal from UNICOR. In fact, I do not specifically recall speaking directly with inmate Davila-Bajana about any concerns during his tenure in the UNICOR factory. Likewise, I was never informed by another staff member that they had received a complaint from inmate Davila-Bajana regarding any conditions in the UNICOR factory.

20. If inmate Davila-Bajana, or any other inmate, for that matter, had complained to me about the quality of the air in the UNICOR factory, I would have referred him to the 2001 and, subsequently, the 2003 air quality inspections, which showed that the air quality in the UNICOR factory was well within the permissible limits established by Occupational Safety and Health Administration (OSHA). Additionally, I would have forwarded that complaint to both my supervisor, the Superintendent of Industries, and the Safety Manager.

Attachment F is a true and correct copy of the 2001 air quality test results received from Microbac Laboratories. Attachment G is a true and correct copy of the 2003 air quality test results received from OSHA.

21. Furthermore, to the best of my recollection, inmate Davila-Bajana did not report any work-related injuries or illnesses to me, nor did he request any special safety equipment that he could use at his inmate work assignment.

I declare under penalty of perjury in accordance with the provisions of 28 U.S.C. § 1746 that the above is accurate to the best of my knowledge and belief.

_____          _____
Martin Sapko                                 Date
Factory Manager
FCI McKean