IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUAN DAVILA-BAJANA,                    :
                                       :
          PLAINTIFF,                   :
                                       :
                                       :
     -VS-                              :
                                       :
                                       :
TIM HOLOHAN, et al.,                   :
                                       :
          DEFENDANTS.                  :    CIVIL ACTION NO. 04-253E
                                       :
                                       :    JUDGE: Sean J. McLaughlin
                                       :    Ch. Mag. Judge: Baxter
                                       :

---

RESPONSE TO:

DEFENDANTS' **SECOND** "MOTION TO DISMISS OR IN THE ALTERNATIVE,

MOTION FOR SUMMARY JUDGEMENT"

1. NOW COMES, Juan Davila-Bajana, Pro Se (Plaintiff); and
hereby respectfully submits his Response/Opposition to the Defendants'
Second Motion to Dismiss, or in the Alternative, Summary Judgement.
(Motion to Dismiss). And as set forth more fully below, Plaintiff
maintains that his Cause is based on/in well established law
that any reasonable Federal Bureau of Prisons (BOP) official/employee
would have known, or, at a minimum, should have known.

2. To wit, Plaintiff is presently placing before this Honorable
Court a Claim of retaliation based on well-established law.
Notwithstanding the fact that there is/are clearly promulgated
Program Statements (Policy) of the BOP which clearly bar such
action(s). And the individual Defendants are trained in same.

## PROCEDURAL BACKGROUND

3. Plaintiff has initiated the instant cause seeking to recover damages based on/in BOP employees violating his Constitutional, Statutory, and Regulatory Rights.  In sum, Plaintiff is seeking redress based on the fact that the Defendants, BOP employees and Federal Prison Industries (FPI or UNICOR) employees, retaliated against him for exercising his First Amendment Right to access the courts.

4. In the interim, Plaintiff's Cause has spent an extended period of time moving through the pre-trial pleadings that are an inherent part of the United States judicial system.  Of the main import to the instant set of pleadings is that the Honorable Susan P. Baxter, Ch. Mag. Judge (Judge Baxter); has Issued a Scheduling Order in which the interested parties were given leave to conduct Discovery and to file certain Documents/Pleadings with the Court with respect to the upcoming Trial.

5. At the present time the parties have made their first round of Discovery disclosures and responses to their First Interrogatories. And the time(s) for filing of the Witness Narratives is/has been extended (for Plaintiff) to and including  02 / 28 / 07 . As such, the parties are presently timely before the Court and this Response will allow for timely Ruling on the present Motion to Dismiss.

6. Plaintiff would also note that Judge Baxter has extended the corresponding time(s) for the Defendants to file their respective Narratives with the court in conjunction with Plaintiff's extension. All of the above is based on the fact that the Court has already Denied Defendants' <u>First</u> Motion to Dismiss with respect to the

Second Claim of the Complaint.  To wit, the Claim of Retaliation by the Defendants.

### STATEMENT OF FACTS

7.  As set forth in the Complaint, BOP Administrative Remedies, and subsequent pleadings filed with this Court; Plaintiff has maintained that the Defendants' have, jointly, severally and individually, retaliated against him for complaining about the Second Hand Tobacco Smoke (Environmental Tobacco Smoke or ETS) and the Silica Dust within the factory.  In fact, Plaintiff had filed his Grievance with the institutional administration upon his being terminated from the UNICOR facility because of this perceived reason for his release from same. See: Ex. ___, to

8.  In the Defendants' First Motion to Dismiss, they ardently argued that Plaintiff did not exhaust his "remedies" with respect to the Claims raised in his Complaint.  The apex of the pleading process with respect to that Motion is/was that the Court found that Plaintiff did not exhaust his First Claim and that his Third Claim was past the limitation period set by statute.  Plaintiff is presently awaiting a Briefing Schedule to have the Third Circuit review the dismissal of the First Claim for non-exhaustion; as the BOP has/had specifically responded to that exact issue in the Administrative Remedy Responses at all levels of the process.

9.  But notwithstanding that, the Defendants' now have professed a "defense" to base their Second Motion to Dismiss on: Defendants now are basing the dismissal of Plaintiff from his UNICOR employment

pursuant to a security issue which is/was resultant from an alleged incident with a weapon and/or weapon making materials. Furthermore, the Defendants' collectively are making declarations to the Court that Plaintiff Davila had not "complained" to any of them about the ETS and/or silica dust (Dust) at the factory.

10. Plaintiff maintains that he did, in fact, complain of the ETS and dust in the factory to the Defendants and that this was done verbally. But the "complaints" that were made were done informally as per BOP Policy requires. The BOP Administrative Remedy Process, P.S. #1330.13, clearly mandates that an inmate must, prior to filing an Informal Resolution, address his concerns to the supervising officer / staff member, which is what Plaintiff did in the case sub judice. He verbally complained to the officers at the prison factory and thereby noticed them of his discomfort and that he was experiencing difficulty from the ETS and Dust.

11. But the main issue here is that this/these "complaints" were not logged in any way until Plaintiff had been removed from UNICOR simply because he had not deemed that that was necessary up until that point. However, once he was removed, so close after his verbal complaints, from UNICOR, he understood that that was why he was losing his job. Especially as he was not told that he was being removed from UNICOR for any reason; but was instead being moved to the day shift. Which he understood to be some sort of response to his complaints of the ETS and Dust from the evening shift supervisors.

12. Additionally, Plaintiff will state that he did, in fact, receive an Incident Report (#970964  ) for a violation of BOP Policy for the possession of weapons making materials previously.

4

In the present cause, however, Plaintiff has/had not received
any such disciplinary action for any such conduct.

13.   Moreover, the inmates who were dismissed from the evening
FPI work shift with Plaintiff (at least one), were reinstated
to UNICOR factory.   These inmates,  inmate Aponte and inmate Cortez
(see: Declaration of David English, Ex.2 to M. to Dismiss, p.3, ¶8);
filed grievances about being released from their prison jobs.

14.   Also, upon information and belief, there were other
inmates at the prison factory who had complained of, and filed
grievances on, the ETS and Silica Dust in the factory.   [Plaintiff
is presently seeking additional discovery from the Defendants
with respect to these Complaints.   To wit, seeking copies of
the Administrative Remedies which were filed based upon the
ETS and Silica Dust.]

15.   So, as noted by Defendant English , Plaintiff was not
noticed of why he was being "sent home" from work at the time
he was being released.   And he was, the next day, taken to the
Captain's Office and had an interview with him and others pertaining
to the alleged contraband materials in Plaintiff's work area.
See: Declaration of Juan Davila-Bajana, Attachment 1.

16.   So, while the Defendants now profess, and may even
be correct, as to the reasoning he was released from his UNICOR
work; the fact still remains that other inmates had made similar
complaints about the ETS and Dust and had also filed Administrative
Remedies on same.   And Plaintiff knew this and felt that his
verbal, informal, complaints to the staff members at UNICOR
put them "on-notice" that he could, probably would, be doing
the same.   In fact, at the time that Safety Officer Housler was inter-
viewing Plaintiff to withdrawal his Grievance, these inmates were there.

17.    So, when the following day after my  meeting with the
Captain and other prison security officers, I was not placed in
the Special Housing Unit (SHU), as had been done previously
for the same type of alleged conduct, and did not receive any
disciplinary Incident Report; I  naturally assumed that this
was just a normal questioning.  And I did not attribute my removal
from UNICOR directly to this.

18.    And I did repeatedly talk to the appropriate officer
to get reinstated back to the Unicor Factory for work.  See:
Declaration of Davila, infra.   And the only real response that
I received, after having already asked more than one officer
and having been told more than once that they would "check into
it"; I was finally told that I could not get my job back at
the UNICOR Factory because someone was really mad at me by
Defendant Holohan while he was acting Superintendent of Industries.

19.    I still believe that the UNICOR staff retaliated against
me in expectation of my filing my Administrative Remedy on the
ETS and Silica Dust.  But even if the reason for my dismissal
was for the alleged contraband materials and that it did/would
pose a safety risk to staff and inmates -- it is still retaliatory
simply because the staff involved did not follow the procedures
set forth in the FPI Program Statement 8120.02.

20.    Therein there are a number of instances of when and
how an inmate may be removed from UNICOR work.  But none of
the provisions provide for an exact reiteration of the circumstances
of the present cause.  This is so as in Chapter 4, Section 4
[INMATE WORKER DISMISSAL] does not list this scenario directly,
but does reference in §c those inmates who have committed a

6

prohibited act.   To wit, violation of BOP Policy on inmate discipline.

21.    Additionally though, Plaintiff will note for the Court that UNICOR [FPI] Policy clearly does allow for a review by factory staff with respect to the alleged facts by Defendants. Specifically,   Chapter 3, §4(a) of the FPI Policy states:

> The [Superintendent of Industries] SOI has authority to refuse an FPI assignment to an inmate who, in the judgement of the SOI, would constitute a serious threat to the orderly and safe operation of the FPI factory. **A refusal to assign must be documented by a memorandum to the unit team listing reasons for the refusal, with a copy to the position classification files in FPI. Typically, the reasons should include other earlier (ordinarily within the past twelve months) documented violations of the FPI inmate worker standards or institution disciplinary regulations.**

Second Motion to Dismiss, Attachment A, Exhibit 3; "Program Statement 8120.02: FPI Work Programs for Inmates".   (Bold added).

22.    In sum, the underlying principles set forth for the "reason" that Plaintiff is/was removed from his prison job at the FPI Factory is, in and of itself, plausible.   However, the fact is that there is a procedure that must be employed in order for the relevant actors to undertake this type of work assignment denial.   See ¶ 21, id.

23.    Moreover, the Defendant Forsyth,   states that this type of review was undertaken by other staff members shortly after Plaintiff's being removed from UNICOR.   See: Declaration of Forsyth, Ex.3 to M. to Dismiss, p.2, ¶6. Therein Defendant ⁻ Forsyth , clearly says that this was the reason that Plaintiff is/was not returned to UNICOR.   But at this time, in response to his Discovery Request referenced ante; the Defendants have provided him a copy of his Inmate Central File.

24.    A telling discrepency with Plaintiff Davila's Central
Inmate File; is that it does not contain the referenced Memorandum
documenting the above reiteration of facts to justify his removal
and/or refusal to employ him at the prison factory.  See: Declaration,
infra; and Affidavit of Plaintiff, Attachment A.  In fact, since
the Defendants', singularly and/or severally, now profess, by
and through their Attorney(s), that the reason for Plaintiff's
removal/refusal of UNICOR is/was for the "scrap materials" which
could allegedly be used to fashion weapon(s): it is paramount
that this Memorandum would have had to been made.  And not only
placed in Plaintiff Davila's Central File -- but also would
have been retained by/in the "position classification files
in [UNICOR]."

25.    The import of this is simply that even if the Memorandum
had not appeared in the Central File; it axiomatically should
have been provided by Defendant  Forsyth , with her Declaration
as an Exhibit.  As she, and/or the Attorney of Record, could
have, and should have, secured same in order to support her
Claim -- especially when the declaration is made in support
of a dispositive motion.  This is the normal course for such
pleadings simply because of their very nature.  Notwithstanding
the fact that they (the Motion to Dismiss, and/or, Summary Judgement)
are specifically designed by and through the Civil Rules to
allow for the submission of that exact type of documentation
to the Court.

26.    Plaintiff Davila states that he was questioned about
this "incident" as reported by Defendant  Forsyth ; but was
initially informed that he was "lucky to still have a job, watch

8

the call-out for your change to day shift."  Then the next day
was questioned by the Captain and other BOP staff with respect
to the scrap materials -- and then told to return to the housing
unit without being placed in the Special Housing Unit (SHU)
as is normally the course of such an "investigation" for allegations
such as weapons materials.

27.  In fact, as noted by the Defendants' in their present
Motion and Brief; Plaintiff Davila has previously been charged
with, and found to have committed, a violation of the BOP Code
305: Possession of anything unauthorized.  See: Exhibit 1, Attachment
E, to Motion to Dismiss.  So Plaintiff is well aware of the
"standard" procedure for such a violation -- even when it is
something  as simple as a piece of sand paper used in the factory
and not necessarily something  that is/was discarded and now
being converted to another use.

28.  The underlying problem with Defendants' "11th-hour"
defense is simply that the Policy of the BOP was repeatedly
violated if this is the real reason for removing Plaintiff from
UNICOR and then not allowing him to return.  First, when the
scrap materials is/was "discovered", an incident report should
have been written -- or the inmates who were believed to be
associated with it (Plaintiff and inmates Aponte & Cortez),
should have been removed to the SHU under investigation.

29.  This would have been done by simply issuing a Detention
Order and referring the incident to the Special Investigative
Services (SIS) Lieutenant.  Not simply removed from the assigned
work area and then questioned -- though this could be one way
to handle such an inquiry.  But when no inmate is/was deemed
to have been involved in this activity, to wit, no Incident

9

Report was issued for any violation of the BOP Policy; they all could have been returned to the factory.

30.    In the instant case, in fact, one inmate (Aponte), was returned to the factory; one was released from prison (Cortez), and Plaintiff Davila was denied return to the factory.  Which is now being professed to have been due to the fact that the scrap materials were in the "vicinity" of his work area and that of the other inmates.  And since they were cleared and allowed to return to their factory job -- Plaintiff should also have been offered his employment there.

31.    But in the interim after his release and inmate return to the factory, Plaintiff Davila had filed an Administrative Remedy against the factory for the ETS and silica dust.  Which is why he thought that he was being retaliated against by not being returned to his previous factory employment and ultimately filed a complaint on, and is now before the for said retaliation. Which the Defendants now claim is not the reason for his removal and subsequent failure to rehire at the prison factory.

32.    So Plaintiff now has an alternative or second claim of Retaliation -- that he was not returned to the UNICOR work in retaliation for his alleged involvement in the scrap materials. When he was not charged with and was never found to have been directly involved in.  So the Defendants, as noted in Defendant Forsyth's  Declaration and Exhibits; were acting in an arbitrary and capricious manner towards Plaintiff because if they did, in fact, make the necessary findings against Plaintiff -- they did not do the proper paperwork simply because they knew their actions were not justified and retaliated against Plaintiff for his past conduct and assumed prison affiliations.

COUNTER STATEMENT TO DECLARATIONS OF DEFENDANTS:

DECLARATION OF MARTIN SAPKO, FACTORY MANAGER (EXHIBIT 1):

33.    The graveman of Defendant Sapko's Declaration, with respect to the Claim(s) of the Complaint, appear at ¶¶ 15-20. Thereat he reiterates his position as to the interaction that he had with the Plaintiff during the Acts which constitute the underlying actions of the Complaint.

34. In ¶15, Defendant Sapko states that he met with me, in conjunction with the Business Manager, Defendant Holohan, and the Warden's Executive Assistant.  At that time he told me that the reason for my removal was not due to the concerns as filed in my Grievance with the Warden.  At that time, and still today, I do not feel that he was totally forthcoming with his revelation that he made to me and that I do think that my verbal complaints about the factory conditions were at least partially responsible for my not being returned to my factory job.

35.    At no time was I told that could not be returned to my UNICOR job.  In fact, at ¶17 Defendant Sapko specifically states that he told me to "discuss the matter with the Superintendent of Industries".  (Defendant Forsyth).  And while he states that he did not make my return to the factory absolutely contingent on the fact of my withdrawing my Grievance -- he did make it seem that the Grievance was a "sticking point".  It was quite obvious that he wished for me to withdraw my complaint about the factory conditions.

36.    So while he did not state: "drop the grievance and I'll make sure you get your job back"; he did say that we "need to get this taken care of".  And in prison speak, he was unequivocally

11

telling me that he wanted the Grievance to "go away" before
I would be reinstated to my UNICOR job.

37.    As for Defendant Sapko not having direct interaction
with myself as to my previous verbal complaints; I will state
that I would believe that he would have been informed by the
other factory staff as to my "complaining".  And I will state
I told/complained to Officer Nolan and
about what I believed to be excessive dust and cigarette smoke.
This is partly due to the fact that I did not smoke and it bothered
me quite a bit when someone smoked around me.

38.    Then in ¶20, Defendant Sapko states that he would have
referred me to the "2001 and, subsequently, the 2003 air quality
inspections, which showed that the air quality in the UNICOR
factory was well within the permissible limits established by
[OSHA]."  And thereafter he references the Attachments F (true
and correct copy of the 2001 air quality air test results from
Microbac Laboratories) and Attachment G (true and correct copy
of the 2003 air quality test results received from OSHA).

39.    The first Attachment F is supportive of Defendant Sapko's
point of view if you read through to the back section where
it includes a copy of the air test done by the referenced laboratories.
But it should be noted that the first page is a letter from
OSHA in Erie, PA, which states that there had been complaints
about the air quality at the factory.  This is the reason for
the subsequent test done by the outside laboratory and the resulting
findings that, at that time, the UNICOR factory at McKean was
not violating any established guidelines.  Though the actual
date of the test was nearly two (2) years **before** the time period

relevant to the present cause.

40.    Next, the Attachment G is not nearly as supportive
of Defendant Sapko's position: it is a "Notice of Alleged Safety
and Health Hazards" dated April 14, 2003 -- or just two (2)
weeks after Plaintiff Davila was sent home from his UNICOR factory
job.  And therefore is much more relevant to the present Cause
due to the timeliness as it is squarely within the time period
relevant to this Cause.  Moreover, the Attachment is actually
a Notice of Violations which were observed and a Notice of the
fact that they needed to be corrected immediately.

41.    Attachment G, when fully reviewed, contains OSHA's
notice of the observed violations at the factory which include:
31 Serious Violations and 3 other.  And the first page of the
Notice, just under the identifying information boxes in the
section marked "Description" -- the Notice clarifies the categories
into which the violations fall under:

> 1. Ventilation is inadequate to control the hazards
>    associated **dusts generated during the production
>    process.  These dusts include but are not limited
>    to wood dust, particle dust, and micore board dust.**
>
>    ...
>
> 3. Dust is accumulating on surfaces throughout the factory
>    area.  This dust includes but is not limited to wood
>    dust, particle board dust, and micore board dust.
>
>    ....

Ibid.  (Bold added).

42.    In sum, the Attachment sets forth the actual "violations"
found to be in effect at the date (April 14, 2003) of the inspection.
There was included in the Attachment the course which was mandated
to correct the violations and a subsequent review finds that
they were corrected.  But the fact is that the Attachment clearly

supports a prima facia showing that there was a problem with
the factory's air quality at the specific time that is relevant
to the present Cause.

43.    And more directly, it supports the fact that Plaintiff
had made "noise" about these violations and that there is/was
reason to have him not in the factory in the upcoming weeks
during the OSHA review.  Also, it would also support a premise
that the Defendants used the purported "scrap materials" as a
reason to remove him from UNICOR.  Then to use same as a reason,
once he filed an official Grievance on the exact issues which
were the subject of the OSHA violations, to refuse him rehiring.

44.    And furthermore, it must be remembered that one of
the other inmates was returned to UNICOR (and the other one
was released from prison).  So this is not good basis for his
exclusion from UNICOR as it was not enough to keep the other
inmate from returning to his UNICOR job.


b)    DECLARATION OF DAVID ENGLISH, WOODWORK SUPERVISOR
      EXHIBIT 2:

45.    Plaintiff has at least two major disputes with Defendant
English.  First, Plaintiff would apprise the Court that at the
time when he asked me to leave the factory during my evening
shift work, allegedly due to the scrap materials being in the
vicinity of my work area; he informed me that he was moving
me to day shift so that "we can keep a better eye on you."

46.    Then when I started to question him as to his meaning,
he told me to "just be glad you still have a job."  At which
time I left the factory and did not know anything else until
the next day when I was called to be questioned at the Captain's

Office.  But was not told by anyone that I was going to be released

from my UNICOR job because of this alleged "incident".

47.  Next, at paragraph 6, Defendant English states:

> It is my further recollection that, at all times relevant
> to this action, inmate Davila-Bajana was a regular
> smoker ....

Ibid.

48.  Plaintiff Davila will state for the Record that at

no time was he ever a regular smoker.  I never smoked cigarettes

and did not smoke them during the time that is relevant to this

Cause.  See: Declaration, infra.  So Defendant English is obviously

"remembering" someone else or is specifically making false statements

to the Court to protect his true motivation for his sending

me home from work that evening.  And subsequently not having

me rehired.  See also: Declaration of Aaron Farley, Ex. A.

49.  I will concede that there were possibly times when

I was in the area of the smoke area; but I was not smoking.

I would need or wish to speak to other inmates or staff who

were in the smoke area and would go there to speak to them.

But this was for short periods and only if I truly felt that

the topic could not wait until another time when the person

was not in the smoke area.


c)  DECLARATION OF DEBORA FORSYTH, ASSOCIATE WARDEN,
    EXHIBIT 3:

50.  Defendant Forsyth's Declaration is replete with inconsistencies

and other errs.  The worst of which begins at ¶5 of said Declaration.

Thereat she states that "a piece of sharpened metal was found

in the vicinity of [Plaintiff's] work area."  But this is in

direct conflict with the Declaration of the staff member who

found the "scrap materials".  To wit, Defendant English as noted
above.

51.  Moreover, the "scrap materials" were not metalic, but
were, in fact, plastic.  But the important thing that must be
gleaned from this statement is that it is directed at the Court
to do nothing more than demonize Plaintiff before the Court.
It is done simply to make it appear that he was supposedly being
caught with weapons making materials, or completed weapons,
when in fact he had not been "caught" doing anything.

52.  Defendant Forsyth is attempting to make it look like
the previous incident report, which ultimately was reduced to
a code 305, possession of unauthorized materials, was indicative
of future conduct.  When the truth is that the present incident
was no incident at all, but just that there was materials found
in the "vicinity" of Plaintiff's work area.  But he was never
charged with any misconduct, nor the other inmates, and the
other inmates were allowed to return to the factory.

53.  In the following paragraphs of the Forsyth Declaration,
6 and 7, the Defendant clearly is trying to make the Plaintiff
look like a terrible person and nothing more.  And that Your
Honor should find in her favor simply because of that -- because
the sworn statement is an obvious lie to the Court.  The materials
supplied to the Court previously and those filed with this very
Motion to Dismiss, or Summary Judgement, show that Defendant
Forsyth is making false sworn testimony to the Court.

54.  In fact, in ¶ 7, Defendant Forsyth clearly states that
Plaintiff had been "removed from UNICOR work assignment **as a
result of his use of UNICOR materials to fashion weapons....**"
Plaintiff Davila had not been found to have committed such conduct,

in either of the incidents.  The first time was simple possession
of sand paper which was part of the UNICOR factory work materials,
and the second time he was never "found" to have done anything.

55.    And in reference to the paragraph 9, Plaintiff Davila
had repeatedly approached the Defendant Forsyth about being
returned to the UNICOR factory.  This was done in the belief
that she would be more receptive to his being returned to the
factory.  But every time that Plaintiff approached Defendant
Forsyth, she rebuffed him and it was Defendant Holohan who ultimately
informed Plaintiff that he would not be reinstated to the UNICOR
factory at FCI McKean.  See next Section.


  d)    DECLARATION OF TIM HOLOHAN, BUSINESS MANAGER, EXHIBIT 4:

56.    Initially, Plaintiff references ¶ 5, as it also relies
on the 2001 and 3003 air quality surveys.  As set forth above
in ¶¶  38 - 44; this is a misplaced trust as at least one of
the Exhibits is too old to be relevant to the present Cause
-- and the second one clearly does, in fact, list some 34 violations
of the UNICOR factory as found by OSHA.  And there are two categories
of violations which specifically find violations that are of
the nature that Plaintiff has been referencing throughout the
time period of this Action.

57.    In fact, at ¶ 7, Defendant Holohan specifically states
that he spoke with Plaintiff in April of 2003.  This is the
exact month that the violations were found by OSHA.  See: Attachment
B to Exhibit 4 of Motion to Dismiss (same OSHA Notice referenced
id in ¶56).  So it is obvious that the motivation for the resolution
of Plaintiff's Complaint, to wit, to make it "go away", as noted
ante; was of paramount concern.

58.    Additionally, it must be remembered that the factory was given until August to correct the violations as noted that the dates of the Notice are from April to August of 2003.  So Plaintiff deems that this was why he was not allowed to return to the factory by Defendant Forsyth above.

59.    Next, it is interesting that Defendant Holohan is the second Defendant to claim that he was the one who made a decision pursuant to BOP Policy not to have Plaintiff returned to the factory.  <u>See</u>: Declaration at ¶10.  But again, as noted above, there is no memorandum in Plaintiff's Central Inmate File that says this, nor is there one produced as an Attachment to the the Declaration of Defendant Holohan -- as he would have had to place one in the files at UNICOR and could now produce same.

60.    But again, Plaintiff states that this never took place and the Defendant(s) are merely making up "facts" and proffering false Declarations to the Court to cure their act(ion)s.  This it not legal and must be dealt with strongly when a person makes false testimony to the Court.


## ADDITIONAL FACTS:

61.    At this time, during the preparation of this Response; Plaintiff has been called to the UNICOR factory and has been offered his UNICOR job back by Defendant Sapko.  This took place on Monday, February 12th, 2007, at approximately 9:30 am.

62.    The sum of the "offer" is/was that Plaintiff would be reinstated to his UNICOR job as a new hire.  This is not acceptable to Plaintiff as he is seeking his back pay, reinstatement with his previous longgevity, raises, and so forth.  But Defendant Sapko flatly rejected this a "deal breaker" and Plaintiff declined

to accept return to the factory under his terms.

63.    Plaintiff Davila states that at no time was there any
discussion of his, or any other UNICOR staff member, making
a determination to rescind the decision to bar me from return
to the UNICOR factory.   There was no reference to removing any
memorandums from the  file  or the files of the UNICOR factory.
So I do not know under what authority he was going to have me
reinstated as I would think that the previous two (2) decisions
would still be binding.

64.    The above set forth Statement of Facts and Counter
Statement to Declarations or Defendants; is all stated under
the penalty of perjury.  And Plaintiff simply did not deem it
necessary to set forth his own separate Declaration simply because
he could do so with a Declaration within the Response.  See:
Declaration, infra.

## DISCUSSION

65.    Plaintiff is not going to set forth a long complicated
argument in regards to the Arguments made by the Defendants.
This is so as he has already shown where the Facts and Declarations
placed  before the Court are in err and as such any Argument(s)
based on/in them is faulty.

66.    Plaintiff submits that there is evidence of his complaining
about the air quality of the factory.  This is something that
can, at least at this point, be shown by circumstancial evidence.
And Plaintiff has shown this above by the fact that the Defendant
have clearly misquoted Exhibits, other staff, and specifically
misstated facts to the Court.  Not just in the singular -- but

in conjunction with statements that directly conflict with other Declarations and the Exhibits as submitted.

67.   In fact, the Constitutionally Protected Conduct is that Plaintiff was complaining verbally and was seen by staff, to wit, Officer Nolan, Defendant Holohan, Safety Manager Housler, talking to other inmates who had been filing grievances on these very issues.   So Plaintiff was clearly understood to be in the process of preparing to file his own Grievance.   And, in fact, did file a Grievance even though he was told he was being transferred to the day shift.   (Though he was not actually transferred).

68.   And while Plaintiff "perceived" this to be the reason for his being dismissed, the Defendants now state otherwise. But as no incident report was written, it clearly undermines their position.   Notwithstanding the fact that they also rely on their own personal decision as per Policy to disallow Plaintiff to work at the UNICOR factory.   Yet they had not followed Policy and did not complete the process for such a refusal to work at the prison factory.

69.   So, while I did not actually "consumate" the grievance by filing the BOP form(s); I did make "noise" with respect to my dislike and disagreement with the factory conditions.   And no matter what the proffered motivation was to remove me from UNICOR, the fact still remains that I did start the "process" by letting the staff become aware of my displeasure with the conditions that I was being forced to endure.

70.   Moreover, the Claim which is to be placed before the Jury in the upcoming Trial is one of Retaliation.   And Plaintiff deems that the acts of the Defendants are clearly Retaliatory;

20

as he was engaging in protected conduct and the Defendant's have offered no "legitimate penological interest" to justify their conduct. To wit, the proffer has clearly been shown above to be in direct conflict with BOP Policy. As such, it cannot be accepted as "legitimate".

71. And as set forth more fully above, Plaintiff had spoken to the Defendants about being returned to the UNICOR factory. This was done with Defendants Holohan, Forsyth, and Sapko. But as the Defendants clearly violated BOP Policy by not properly refusing him return to the factory, they were retaliating against him because of the Grievance against the factory conditions -- not for his alleged weapons making.

72. Because the Defendants were not following policy and/or were doing so for the wrong reasons, they are not protected from liability because of qualified immunity. They must be acting within the scope of their employ in order to be protected -- but when they are clearly violating the very policy which they rely on to protect them -- they cannot prevail on such a defense. In sum, they were not "doing their job", but were doing what ever they felt like and are now trying to create a reason which is pursuant to policy and trying to twist the facts to fit the cure.

73. There just can be no dispute that the Defendants knew that they could not refuse Plaintiff factory employment without just cause. And to do so because he was complaining or filing Grievances -- or even for weapons materials -- without following BOP Policy is <u>prima facia</u> evidence of constitutional violations. To wit, they were retaliatory acts in-and-of-themselves.

74.    In sum, the sections raised by the Defendants are responded
to as such:

1.    Plaintiff has now placed before the Court his verified
      Statement, ante, under the penalty of perjury, see
      Declaration infra, of his notifying the Defendants
      and their actors, of his Complaint about the ETS
      and silica Dust.

2.    The "Claim" of this Complaint is the retaliation
      for removing and not returning Plaintiff to his UNICOR
      job; and this denial of such a preferred prison job
      on an extended basis would clearly "chill" a prisoner
      of normal constitution from filing grievances and/or
      complaints about conditions at the factory.

3.    Plaintiff has conclusively shown in his Statement
      of Facts that there is clearly a nexus between his
      constitutionally protected conduct and the acts of
      the Defendants.  They were informed by the floor
      staff at the factory that Plaintiff was complaining
      of the conditions and associating with those inmates
      who had already filed Grievances.  So while they
      attempt to hide behind an official notification by
      Plaintiff before their retaliatory actions; they
      were still aware of same.  Especially as they all
      admit to having walked the factory floor and would
      have seen Plaintiff talking to these inmates and
      knew who they were as they, by their own admissions,
      were the ones who would have been tasked with dealing
      with such complaints -- verbally or written.

22

4.   As set forth more fully above in the Statement of
Facts, the BOP Policy now professed to having been
followed was clearly violated because the Defendants
have not produced, as they cannot do so, the Memorandum
that states Plaintiff Davila was not employable at
UNICOR.  So there is no "legitimate penological reason
for Plaintiff's removal" and/or refusal to return
to the factory.

74.   The last section about the Defendants' qualified immunity
clearly fails on its face: the Defendants violated BOP Policy
and can never use same as a shield if it was not used for the
acts covered by the Complaint.


<u>CONCLUSION</u>

75.   Plaintiff has shown that there are issues of material
facts which are in dispute.  As such, Summary Judgement is inappropriate
at this time and the disputes of facts must be placed before a
Jury.  And Plaintiff will also file his Narratives with the Court
next week and also will be requesting additional Discovery based
on the revelations in the presently pending Motion to Dismiss
and/or Summary Judgement.


Respectfully Submitted,

## DECLARATION AND CERTIFICATE OF SERVICE

I, Juan Davila-Bajana, hereby declare under the penalty of perjury, pursuant to 28 USCS §1746(2), that the foregoing pleading is true and correct to the best of my recollection and belief, and that I served a true and correct Original on the Clerk of this Court and Paul D. Kovac, AUSA, 700 Grant Street, Pittsburgh, PA 15219, this 16th day of February, 2007.

_____
Juan Davila-Bajana, Pro Se
Fed. Reg. No. 47580-053
FCi McKean
P.O. Box 8000
Bradford, PA 16701

2/16/07

Juan Davila-Bajana
Reg. No. 47580-053
FCI McKean

Case No.  04-253(ERIE)

Dear Sir:

Please find enclosed my Response due this date to motion for Summary Judgement. I will submit my Exhibit under separate cover on Tuesday in Wednesday next week. Thank you.