IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUAN DAVILA-BAJANA,<br>    Plaintiff,<br><br>v.<br><br>TIM HOLOHAN, et al.,<br>    Defendants. | ) <br>) Civil Action No. 04-253 Erie<br>)<br>)<br>) District Judge Sean J. McLaughlin<br>) Magistrate Judge Susan Paradise Baxter<br>) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that the Defendants' motion to dismiss Plaintiff's complaint or, in the alternative, for summary judgment [Doc. # 117] be granted. The Clerk of Courts should be directed to close this case.

### II.    REPORT

#### A.    Relevant Procedural History

On September 7, 2004, Plaintiff Juan Davila-Bajana, a federal inmate incarcerated at the Federal Correctional Institution at McKean ("FCI McKean"), commenced this *pro se* civil rights action pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"). He raised three separate claims. First, he contended that his Eighth Amendment rights were violated by Defendants after allegedly exposing him to an "amalgamation" of environmental tobacco smoke ("ETS") and silica dust (which was created by the cutting of Micore Board) during the course of his employment inside a prison factory run by the Federal Prison Industries (hereinafter referred to by its tradename "UNICOR").[1] Second, he

---

    [1] At the time, UNICOR manufactured office furniture and it used Micore Board in the manufacturing process. This

(continued...)

1

claimed that he was removed from that work assignment in retaliation for complaints he made about the hazardous working environment. Third, he claimed that the government was liable under the FTCA for the negligent acts of its employees in exposing him to the hazardous working conditions of UNICOR. Doc. # 6. Named as Defendants in the Complaint are: Tim Holohan, UNICOR Factory Manager; Martin Sapko, UNICOR Factory Manager; Debora Forsyth, Superintendent of Industries; Dave English, UNICOR General Foreman; Robert Klark, Camp Administrator; Stephen Housler, Safety Manager; and the United States of America.[2]

Defendants filed a motion to dismiss. The Court agreed that Plaintiff had failed to administratively exhaust his Eighth Amendment claim and, accordingly, dismissed that claim. The Court also dismissed the FTCA/negligence portion of the Complaint as untimely. See Docs. # 45, # 49, and # 52. As a result, only the retaliation claim survived.

After a period of discovery, Defendants moved for summary judgment of Plaintiff's retaliation claim. The Court granted their motion. Docs. # 90 and # 94. Plaintiff filed an appeal. On February 5, 2009, the Court of Appeals affirmed the dismissal of the retaliation and FTCA claims. However, it determined that Plaintiff had administratively exhausted his Eighth Amendment claim and therefore it vacated this Court's decision dismissing that claim and

---

[1](...continued)
case is one of several cases filed by an inmate at FCI McKean in which it has been claimed that the inmate was exposed to silica dust while working at the UNICOR factory. On March 14, 2007, this Court issued a Memorandum Order granting the defendants summary judgment in several of the other cases (which had been consolidated for discovery and which shall be referred to collectively as the Ward silica dust cases). See Ward v. Lamanna, Docket No. 04-11 (W.D. Pa.); Kelly v. LaManna, Docket No. 03-368 (W.D. Pa.); Kenny Hill v. Lamanna, Docket No. 05-160 (W.D. Pa.); Michael W. Hill, 03-323; and Siggers v. LaManna, Docket No. 03-355 (W.D. Pa.). The plaintiffs in Ward, Kelly, and Kenny Hill appealed, and on June 15, 2009, the Court of Appeals issued a non precedential opinion affirming this Court's grant of summary judgment. Ward, et al. v. Lamanna, 334 F.App'x 487 (3d Cir. 2009).

Similar to the plaintiffs in the Ward silica dust cases, in this case Plaintiff Davila-Bajana contends that Defendants violated his Eighth Amendment rights by exposing him to silica dust during his work at the UNICOR factory. He also adds an allegation that he was exposed to hazardous amounts of ETS.

[2]

Defendants move to dismiss this action with respect to Defendants Forsyth and Klark pursuant to Rules 12(b)(2) & (b)(5) because they have not been personally served with the Complaint and summons in accordance with Rule 4, and efforts to obtain additional directions for service from the Plaintiff have been unsuccessful. See Doc. # 39 & # 44. As Plaintiff's claims against all Defendants, including Forsyth and Klark, do not survive summary judgment, this Court need not address this alternative basis to dismiss the claims against them.

2

remanded the case for further proceedings. See Doc. # 100.

Thus, presently before this Court is Plaintiff's Eighth Amendment claim against the individual Defendants, alleging that they were deliberately indifferent to his health and safety by exposing him to hazardous working conditions in FCI McKean's UNICOR factory. In the Complaint, he makes the following allegations with respect to that claim:

> From the genesis of Plaintiff's employment in FCI-McKean's UNICOR Factory until 3/12/2003, Plaintiff consistently complained about the excessive [ETS] and silica dust in the factory due to the gross negligence and deliberate indifference of the named Defendants to Plaintiff['s] Health and Safety.
>
> The [ETS] cause[d] by BOP UNICOR staff and UNICOR Inmates amalgamated with the silica dust and because the named Defendants negligently and deliberately refused to control the Dust and Smoke, through proper ventilation system and by providing Plaintiff with proper equipment and adherence to Occupational Safety and Health Administration (OSHA) standard rules and regulations, Plaintiff [has] suffered and continue[s] to suffer and will suffer in the future permanent injury which include but not limited to shortness of breath, dizziness, heart blockage, chronic obstructive pulmonary disease and airway obstruction.
>
> * * *
>
> [OSHA] repeatedly sited [sic] UNICOR in 1993 for violation of air and dust acceptable level in factory.
>
> The named defendants conducts as stated above violated my Eighth Amendment right to be free from cruel and unusual punishment by deliberately, sadistically and negligently repeatedly exposed me for years to excessive ETS and silica dust.

Doc. # 6 at ¶¶ 8, 11-12.

On April 28, 2009, the Court conducted a case management conference, and thereafter, a period of discovery ensued. See Doc. # 101. On January 6, 2010, Defendants filed the pending motion to dismiss Plaintiff's complaint or, in the alternative, for summary judgment [Doc. # 117] and brief in support thereof, Doc. # 118. On January 7, 2010, the Court sent to Plaintiff at his address of record an Order notifying him that he had until February 4, 2010, to respond to the motion. Doc. # 119. No response has since been filed by Plaintiff, nor has he made a request for an extension. Accordingly, this motion is ripe for disposition by this Court.

### B. Relevant Factual History

Plaintiff has not contested the following facts outline by Defendants in their brief. All Attachment ("Att.") citations are to those documents appended to their brief at Doc. # 118.

3

At all times relevant to this case, the UNICOR factory at FCI McKean was part of the Office Furniture Business Group.[3] Att. B (Decl. of Martin Sapko) at ¶ 6. Beginning in March of 1999, Plaintiff was assigned to work there. This assignment lasted only a short time before he was removed from the institution. Plaintiff returned in January 2000, and was reassigned to UNICOR, which was his work assignment for much of the time until his ultimate removal on or around March 31, 2003. During the time he was assigned to UNICOR, Plaintiff performed primarily clerical and supply functions. He rarely worked on or around any of the saws or Micore Board, except to deliver supplies to those stations. Id. at ¶¶ 9-17, and Att. B, Ex. 4 (inmate history data); Ex. 5 (inmate work history); Ex. 6 (diagram of UNICOR factory, dated 1/7/98), and Ex. 7 (diagram of UNICOR factory, dated 6/27/03).

### 1. ETS

During the period of time in question (1999-2003), inmates were not permitted to smoke in UNICOR, except in a designated break area. See Att. M (Decl. of Debora Forsyth) at ¶¶ 8-10, and Att. M, Ex. 4 (UNICOR McKean Familiarization Handbook); Exs. 5 & 6 (the diagrams of UNICOR factory); Att. N (Decl. of Tim Holohan) at ¶¶ 7-9; Att. E (Decl. of Stephen Housler) at ¶ 10. When inmates were initially assigned to UNICOR, each was provided with the UNICOR McKean Familiarization Handbook. Each inmate was required to sign and return a page titled Factory Rules. One of the rules on that page indicated: "There will be NO SMOKING in the factory, except in designated smoking areas." Id. At all times relevant to this action, the break area was located in the back corner of the factory, near the packing department. Id. at ¶ 10, and Att. M, Exs. 4-6; Att. N at ¶ 9. Also, access to the break area was limited to scheduled 10-minute breaks, which where generally at 8:50 a.m. and 1:00 p.m. during the day shift, or 7:00 p.m. and 9:00 p.m. during the night shift. Id. at ¶¶ 10-11; Att. N at ¶ 10. If an inmate was

---

[3] The factory at FCI McKean stopped producing furniture in 2006, due to an administrative decision made at the corporate level. The factory now produces plastic goods, such as meal trays, plastic-ware, and cups. Att. D (Deposition of Stephen Housler) at 10-11, 45-46.

smoking in any other areas in the factory, or at any other times, he would be in violation of factory rules. Such a violation could have resulted in immediate disciplinary action and possible dismissal from UNICOR. Id. at ¶ 13; Att. N at ¶ 11.

## 2. Air Quality and Inspections By Microbac and OSHA

On July 3, 2001, the Area Director of OSHA sent a letter to Defendant Stephen Housler, FCI McKean's Safety Manager. The letter advised Housler that OSHA had received a notice of safety hazards regarding the ventilation system in the UNICOR factory. The notice of safety hazards alleged that ventilation was inadequate, employees were being exposed to excessive wood dust, and that dust masks were not readily available. OSHA's letter to Housler indicated that OSHA had not made any determination that the alleged hazards existed, and that OSHA did not intend to conduct an inspection at that time. Nevertheless, since allegations of violations and/or hazards had been made, OSHA requested that FCI McKean investigate the alleged conditions and make any necessary corrections or modifications. See Att. E at ¶¶ 12-14, and Att. E, Ex. 1 (7/3/01 letter).

The Warden responded to OSHA's concerns by letter dated July 27, 2001. In that letter, he described the dust collection system in the UNICOR factory and indicated that dust masks are available in the UNICOR tool room and are issued upon request. Id. at ¶ 15, and Att. E, Ex. 2 (7/27/01 letter).

Soon thereafter, on July 31, 2001, FCI McKean had Microbac Laboratories, Inc. conduct an indoor air quality survey of the UNICOR factory. Microbac tested six different sites in the factory, and all of the sites complied with the OSHA standard for Total Particulates/Nuisance Dust. Id. at ¶ 16, and Att. E, Ex. 3 (Indoor Air Quality Survey). The survey results showed that the air quality was well within the OSHA standards. According to the Microbac Laboratories Summary, the OSHA standard for Total Particulates/Nuisance Dust is 15 mg/cubic meter and 5.0 mg/cubic meter for Respirable Particulates/Respirable Nuisance Dust. According to the Microbac survey, the highest measurement for total particulates was 0.3 mg/cubic meter, and the highest measurement for respirable particulates was 0.4 mg/cubic meter. Id. at ¶ 17; Att. G (1/23/07

Report of Deitrich Weyel, ScD, CIH).

Nearly two years later, on April 14, 2003, OSHA issued a Notice of Alleged Safety or Health Hazards to FCI McKean. The Notice alleged that the ventilation in the UNICOR factory was inadequate to control the hazards associated with dusts generated during the production processes. The dusts included wood dust, particle board dust, and Micore Board dust. The Notice also alleged that the ventilation was inadequate to control the hazards associated with vapors that were produced by glues utilized in the laminating processes. Id. at ¶¶ 18-19, and Att. E, Ex. 4 (Notice of Alleged Safety of Health Hazard); Att. F (Decl. of Brendan M. Claybaugh) at ¶¶ 3-4.[4]

On Wednesday, April 16, 2003, an OSHA compliance officer visited the UNICOR factory at FCI McKean and conducted a walk-through inspection. At the conclusion of the walkthrough, the OSHA inspector gave a verbal indication to Defendant Housler that he found no evidence of concern related to the air quality in the factory, and that all appropriate and necessary practices were being followed in accordance with OSHA regulations. The inspector indicated that OSHA inspectors would return to the factory to conduct a formal inspection. Id. at ¶ 20; Att. F at ¶¶ 4-8, and Att. F, Ex. B (Case File Diary); Ex. C (OSHA Videos);[5] Ex. D (raw data, logs and notes, collected during the air sampling).

On May 14, 2003, the OSHA Compliance Officer conducted a more thorough inspection of the UNICOR factory. On June 17 and 18, 2003, representatives from OSHA returned to FCI McKean to conduct air monitoring of the UNICOR factory. On June 18, 2003, after the air monitoring inspection, the OSHA Industrial Hygienist told Defendant Housler that the air monitoring had gone well, and he did not foresee any violations with respect to the air quality in the UNICOR factory. Id. at ¶ 21; Att. F at ¶¶ 9-11, and Att. F, Exs. B-D and Ex. E (Air Sampling

---

[4] Appended to the declaration of Brendan M. Claybaugh are documents referred to as "Attachments." To avoid confusion with the "Attachments" to the Defendants' brief, this Court shall refer to the documents appended to his declaration as "Exhibits."

[5] Defendants have submitted copies of the OSHA videos that were taken inside the UNICOR factory between May 14, 2003, and June 18, 2003, and which show the conditions in the factory. (Doc. # 20). The videos are part of the file maintained by the Clerk's Office.

6

Test Results).

In a letter dated August 20, 2003, OSHA informed FCI McKean that no OSHA standard applied to the alleged hazards, and no OSHA citation would be issued for the alleged hazards. The letter included results of the OSHA air monitoring, which had evaluated worker exposures to airborne dust concentrations of vitreous fiber and perlite. The results showed that no worker's exposure exceeded 10% of the relevant exposure limit. Id. at ¶ 22, and Att. E, Ex. 5 (8/20/03 letter from OSHA); Att. F at ¶¶ 15-16; Att. G.

Also, between April 16, 2003, and August 1, 2003, OSHA inspectors evaluated the entire UNICOR factory and the FCI McKean prison compound, and on August 20, 2003, a Notice of Unsafe or Unhealthful Working Conditions was issued. None of the citations noted in OSHA's Notice of Unsafe or Unhealthful Working Conditions dealt with the air quality, dust in the air, or any other hazardous conditions relating to Micore Board. Att. F at ¶¶ 17-20, and Att. F, Ex. G (8/20/03 Notice of Alleged Safety or Health Hazards); Att. D at 52-53. In fact, the only mention of Micore Board or the factory air quality in the Notice of Unsafe or Unhealthful Working Conditions was Citation 2, Items 1, 2, and 3. These citations all dealt with training and the way in which information relating to the Micore Board was communicated to inmates, and was termed "Other" or "Other Than Serious."[6] Id.

OSHA also made approximately seven recommendations that were "primarily designated to reduce worker contact with any unavoidable dust which may have been generated." Ex. 5 to Att. E. These recommendations related primarily to air quality: (1) eliminate use of shop vacs for blowing dust off clothes and surfaces; (2) use the available coveralls and provide tight-fitting goggles and caps to keep dust out of worker's eyes and hair; (3) have respirators available and train personnel in their use; (4) eliminate the practice of workers throwing scrap material into an open dumpster that generates dust (instead, use a tightfitting lid and an open rubber flap); (5) use

---

[6] When a violation is termed "Other" by OSHA, that means "a situation in which the most serious injury or illness that would be likely to result from a hazardous condition cannot reasonably be predicted to cause death or serious physical harm to exposed employees, but does have a direct and immediate relationship to their safety and health." OSHA, Employer Rights and Responsibilities Following an OSHA Inspection. See www.osha.gov/Publications/osha3000.pdf. See also Att. D at 53.

7

hand-held sander rather than abrasive pad on boards; (6) train personnel on information contained in the Material Safety Data Sheets; and (7) make sure personnel maintain personal hygiene, cleaning hands and skin thoroughly before eating, smoking, and drinking.  According to the prison officials and a letter to OSHA, they implemented all the suggested corrections (though some took more time than others).  See Id.; Att. D at 55-57.  There is no evidence to suggest otherwise.

### 3. The Dust Collection Systems

The UNICOR factory was equipped with two dust collection systems, each consisting of large dust collectors, extensive duct work, fans, vacuums, and a waste portal.  The dust collectors were operational in the UNICOR factory since approximately September 11, 1989, and each of the two dust collectors had the capacity to move 34,000 cubic feet of air per minute from the UNICOR factory.  See Att. B at ¶ 18, and Att. B, Ex. 8 (Submittal Data); Att. H (Decl. of Michael Salerno) at ¶¶ 5-8.

Micore Board was initially cut to size on the SCMI Horizontal Beam Panel Saw.  This machine had two dust collection connections: (1) a six-inch port connected to the bottom and (2) a five-inch port connected to the top portion of the machine.  Each of these connections provided dust collection to the saw blade at the point of machining.  In the next step of the process, the four edges of the Micore Board were shaped on the Delta Shaper Machine.  This machine had one four-inch port connected to the shaper fence, which supplied dust collection directly at the point of machining.  In the third and final machining operation, the Onsrud Inverted Router was used to create a pocket in the back side of the Micore Board for support brackets.  This operation was only performed on half of the quantity ordered.  This machine had a six-inch port connected to the bottom supplying dust collection directly to the point of machining and a four-inch port connected to a hood located directly over the point of machining to supply dust collection for particles, if any, which were not collected from the bottom.  All of the aforementioned machines were connected to the main dust collection plenum leading to one of the two main dust collection systems.  Id. at ¶¶ 19-20; Att. H at ¶ 8.

Dust and air entering the dust collection system through spiral pipes such as the ones

described above were moved by fans within the dust collection system from the machinery process through smooth round ducts, to a large vacuum located on the outside of the building. The spiral pipes referenced above were actually smooth on the inside for better dust collection. The vacuum pulled dust and air from the factory to one of the two large, cone-shaped filter houses where air was filtered and dust was evacuated into to a hopper, which was also located outside of the UNICOR building. The filtered air was then returned to the factory through square ducts. The dust that was filtered from the factory air was collected in a hopper and disposed of at a site away from FCI McKean and the UNICOR factory. Id. at ¶ 21, and Att. B, Ex. 9 (equipment pictures); Ex. 10 (equipment diagram); Att. H at ¶¶ 7-8. The manufacturing machinery was not to be operated unless the dust collection system was turned on first. Id. at ¶ 19; Att. H at ¶¶ 5-8.

Each of the two dust collection systems produced 34,000 cubic feet/minute, meaning they were each strong enough to move 34,000 cubic feet of air in one minute. On system number 1, there were eight machines drawing dust collection, requiring 9,900 cubic feet/minute. On system number 2, there were 15 machines drawing dust collection, requiring a total of 13,100 cubic feet per minute. This means the dust collection system generated 20,900 cubic feet per minute in excess of the requirements of the factory. See Att. H at ¶ 8; Att. D at 37-38.

As a result of the dust collection systems, the air in the factory was maintained in a better condition than even the air outside. See Att. I (Deposition of Debora Forsyth) at 22-27; Att. F at ¶¶ 5, 13. Additionally, there is no evidence to suggest that these ventilation systems were ever broken, down for repairs, or not operating at full capacity at any time while the factory was operational. See Att. D at 19; Att. H at ¶¶ 18-22; Att. F at ¶¶ 5, 13; Att. G.

Michael Salerno was at all times relevant to this action the Maintenance Mechanic Supervisor at the UNICOR factory. He was directly responsible for ensuring that all of the equipment in the factory was maintained in proper working condition, including the dust collection (or ventilation) system. See Att. H at ¶¶ 1-2, 9. In his declaration, Mr. Salerno states that the dust collection system was fully operational at all times. To the extent there was a problem with the dust collection system, he would either fix it immediately or lock the appropriate piece of equipment until it could be fixed. Id. ¶ 10. He further states that excessive levels of dust

in the factory (even levels which would be well within the OSHA threshold) could have caused significant damage to the machinery and equipment in the factory. Many of the machines were extremely delicate, and had various ball bearings, gears, wheels, and other moving components. Id. at ¶ 18. If there was a significant amount of dust in the air or settling on these components, the resulting buildup of dirt and debris in the machinery components could have caused the machinery to fail. Such damage would be readily apparent by the frequency that the machinery was required to be cleaned, as well as the need to replace ball bearings, gears, blades, and other moving parts. Id. at ¶¶ 19-20. There is no evidence that there was ever a significant amount of dust inside the machinery which would require cleaning. Additionally, Mr. Salerno was never required to effectuate any of the type of repairs which would be associated with excessive dust in the machinery. Id. ¶ 21.

### 4. Plaintiff's Recent Medical Examination

On August 6, 2009, Plaintiff was examined by Gregory J. Fino, MD, FCCP. Att. C (Report of Gregory J. Fino, MD, FCCP). During his examination, Dr. Fino performed a two-view chest x-ray, which revealed "no pleural and no parenchymal abnormalities consistent with an occupationally acquired pneumoconiosis." Id.

Dr. Fino also conducted Pulmonary Function Testing, which revealed no abnormal lung functions. The results of the Spirometry testing were within the normal range. As a result of this examination, Dr. Fino found no evidence of respiratory impairment or disability. He concluded:

> I find no evidence of a respiratory ailment or disability. There was no valid, objective evidence of any respiratory condition.
> * * * *
> There is no evidence of either chronic or accelerated silicosis based on his chest film. The small nodule is probably related to a previous tuberculosis exposure . . . This abnormality has nothing to do with his alleged exposures.
> * * * *
> If there has been any fear of contracting silicosis in the future, the patient should not be concerned . . . If he were my patient, I would not follow him for subsequent development of silicosis and I would assure him that he has no reason to worry about developing silicosis in the future.

Dr. Fino went on to conclude that there was "no evidence of any chronic condition at all related to his exposure." Id.

10

### C. Standards of Review

#### 1. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded,"must be held to "less stringent standards than formal pleadings drafted by lawyers.”" Haines v. Kerner, 404 U.S. 519, 520-521 (1972). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should do so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir. 1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996) (discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990) (same). Because Plaintiff is a *pro se* litigant, this Court may consider facts and make inferences where it is appropriate.

#### 2. Motion For Summary Judgment

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has

failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Company, 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989) (the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Company of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," *i.e.*, if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### D. The Eighth Amendment Claim

Plaintiff claims that Defendants were deliberately indifferent to his health and safety by exposing him to hazardous working conditions in violation of his Eighth Amendment right to be free from cruel and unusual punishment. To succeed on an Eighth Amendment claim based on prison conditions, a plaintiff must show: (i) "he has suffered an objectively, sufficiently serious injury," and (ii) "that prison officials inflicted the injury with deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994).

The first prong of the Farmer test is an objective one. Plaintiff must demonstrate that he has been incarcerated under conditions posing a substantial risk of serious harm. Id. In this context, the Eighth Amendment protects against prison conditions that threaten to cause health problems in the future, not just conditions that cause immediate medical problems. Helling v. McKinney, 509 U.S. 25, 33-34 (1993) (holding that prisoner stated cause of action under Eighth Amendment by alleging that prison officials had, with deliberate indifference, exposed him to levels of ETS that posed an unreasonable risk of serious damage to his future health). To meet this objective standard, however, "the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged conditions]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." Id. at 36 (emphasis in original).

The second prong of the Farmer test is a subjective one, requiring Plaintiff to demonstrate that Defendants acted with deliberate indifference. To establish deliberate indifference: 1) a prison official must know of and disregard an excessive risk to inmate health or safety; 2) the official must be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and 3) the official must also draw the inference. Farmer, 511 U.S. at 837. Thus, "deliberate indifference describes a state of mind more blameworthy than negligence," and requires "more than ordinary lack of due care for prisoner's interests or safety." Id. at 835 (citations omitted).

In light of the foregoing standards, the pertinent Eighth Amendment inquiry here may be defined as follows: 1) was Plaintiff unwillingly exposed to unreasonably high levels of ETS and/or silica dust that society would consider so grave as to violate contemporary standards of decency?; and, if so, 2) were Defendants aware of facts from which an inference was drawn that a substantial risk of serious harm existed, and did they disregard such facts, such that they were deliberately indifferent to an excessive risk to Plaintiff's health and safety?  The burden of proof is heavy for good reason.  Defendants' behavior is not held to a simple tort standard, but a constitutional one – cruel and unusual punishment.  The fact that the evidence here must rise to the level of a constitutional claim, not a tort, is particularly relevant and daunting.

### 1. The Objective Inquiry

With respect to the first prong of the Eighth Amendment analysis, Plaintiff has not satisfied his burden of establishing facts sufficient to support his claim that he was exposed to levels of ETS and/or silica dust in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency.

There is no evidence in the record to show that he was exposed to unreasonably high levels of ETS.  During the period of time in question (1999-2003), inmates were not permitted to smoke in UNICOR, except in a designated break area, and access to the break area was limited to scheduled 10-minute breaks which occurred generally at 8:50 a.m. and 1:00 p.m. during the day shift or 7:00 p.m. and 9:00 p.m. during the night shift.  There is no evidence that any inmates intentionally or regularly violated this rule.  Ex. M at ¶ 13; Att. N at ¶ 11; Att. E at ¶ 10.  Also, in his declaration testimony, Defendant Housler, the Safety Manager, stated that his inspections revealed none of the telltale signs that inmates had been smoking around any of the work areas.  For example, he never observed any of the detritus associated with smoking, such as ashes or cigarette butts on the work spaces or surrounding floors.  Likewise, there was no smoke, or even the odor of old smoke, in the air around the inmates' work areas.  See Att. E at ¶¶ 10-11.  Furthermore, had any inmate been seen smoking, then staff would have imposed appropriate disciplinary measures.  See Att. N at ¶ 11; Att. M at ¶ 13.

Defendants also point out that at no time was Plaintiff's work assignment located in the immediate vicinity of the smoking area. From the time he started working in UNICOR, until late 2002, he held various assignments in the production department (day shift). Beginning in November 2002, and lasting until his ultimate removal from UNICOR in March 2003, he was assigned to the assembly department (night shift). All of these assignments were in the side of the factory farthest from the break area. Att. B at ¶¶ 6-14; Att. M at ¶ 10; Att. N at ¶ 9.

Similarly, Plaintiff has not shown that he was exposed to levels of silica dust in the UNICOR factory that were so unreasonably high as to violate contemporary standards of decency. As set forth above, the conditions present in the UNICOR building did not violate OSHA standards. Respirable silica was not detected in 2001 by Microbac Laboratories or in 2003 by OSHA inspectors. See Att. E at ¶¶ 16-17, 22, and Att. E, Exs. 3, 5; Att. G; Att. F at ¶¶ 10-15, and Att. F, Ex. F. With respect to all of the chemical components of Micore Board, the OSHA inspectors determined that no UNICOR worker's exposure exceeded 10% of the relevant exposure limit. Id. Plaintiff has made no showing that the air quality and conditions in the factory at the time of the testing were inconsistent with or nonrepresentative of the air quality and conditions in the factory on any other period of time.[7] See Att. G; Att. F at ¶¶ 7-16; Att. H at ¶¶ 11-22.

Moreover, as part of his investigation, Mr. Claybaugh (the OSHA compliance safety and health officer) inspected the ventilation equipment at FCI McKean. Contrary to the allegations in the Complaint, the level of dust generated appeared to be adequately exhausted by the system, as supported by sampling the results, and removed through ductwork to an outside repository. As a result, the factory lacked any indication of a problem with the quality of the air. Likewise, there was also no indication that a cloud of dust may have existed previously and been subsequently removed prior to Mr. Claybaugh's arrival, such as: excess dust under the machines, on the sills, or in other hard-to-reach areas. See Att. F at ¶¶ 5-6, 8, 13, and Ex. C to Att. F, Doc. # 120 (OSHA Videos).

---

[7] The OSHA videos do not indicate support for dust clouds or heavy dust exposure in the air within the factory. See *infra* note 5.

Further supporting the conclusion that the air sampling data was taken on a normal day for the factory is the dust collection system. As discussed above, this dust collection system was designed to collect dust at the point of machining. As a result of these dust collection systems, the air in the factory was maintained in a better condition than even the air outside. See Att. M at 22, 27; Att. F at ¶¶ 5, 13. Additionally, there is no evidence to suggest that these ventilation systems were ever broken, down for repairs, or not operating at full capacity at any time while the factory was operational. See Att. D at 19; Att. H at ¶ 21; Att. F at ¶¶ 5, 13; Att. G.

Based on the foregoing, this Court finds that Plaintiff has failed to adduce sufficient evidence to meet the objective standard of Farmer v. Brennan and, thus Defendants are entitled to summary judgment on his Eighth Amendment claim. See Brown v. U.S. Justice Dep't, 271 F.App'x 142, 144 (3d Cir.), *cert. denied* ___ U.S. ___, 129 S.Ct. 317 (2008) (summary judgment proper where plaintiff did not specify how he was exposed to levels of ETS that pose an unreasonable risk of damage to his future health) citing Richardson v. Spurlock, 260 F.3d 495, 498 (5th Cir. 2001) (sitting near some smokers sometimes is not an unreasonable exposure to ETS); and Pryor-El v. Kelly, 892 F.Supp. 261, 267 (D.D.C. 1995) (dismissing an ETS claim in which the plaintiff alleged "only that various unnamed inmates and prison officials smoke 'in the TV room, games room, and the letter writing room.'")). See also Ward v. Lamanna, Docket No. 04-11, 2007 WL 791130, slip op. (W.D. Pa. Mar. 14, 2007) (summary judgment granted because, *inter alia*, plaintiff failed to show that he was exposed to an unreasonably high level of silica dust at the UNICOR factory).[8]

### 2. The Subjective Inquiry

Alternatively, even if it could be determined that Plaintiff was unwillingly exposed to a serious health risk, there is no evidence that Defendants were deliberately indifferent to the situation. See Ward et al., 334 F.App'x at 491 (affirming this Court's grant of summary judgment

---

[8] In its opinion affirming the grant of summary judgment in the Ward silica dust cases, the Court of Appeals held that the plaintiffs could not meet the subjective element of deliberate indifference and therefore it did not reach the objective inquiry. Ward et al., 334 F.App'x at 491 n.8.

for defendants in Ward silica dust cases because in those cases the plaintiffs could not meet the subjective element of deliberate indifference).

In this case, and similar to the Ward silica dust cases, there is no evidence to support a reasonable inference that any Defendant was aware of an unreasonable risk caused by exposure to silica dust. Id. at 491. The summary judgment record shows that FCI McKean and UNICOR staff were unaware of any potential health hazards associated with the dust created by cutting Micore Board prior to the OSHA inspection that commenced in April 2003. It may be argued that this lack of awareness was due to their failure to pay attention, their ignorance, or their failure to acquaint themselves with all of the safety materials available to them. The reason, however, is unimportant. While it may be true that "[a]n act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation, ... an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." Farmer, 511 U.S. at 837-38. See also Ward, 334 F.App'x at 491 (affirming the grant of summary judgment when the facts, even when viewed most generously, only document behavior that indicates possible negligence or carelessness).

As for Plaintiff's allegations regarding his alleged exposure to ETS, while it is true that smoking was allowed in Bureau of Prisons institutions during the relevant period of time, the UNICOR factory policy did not allowing smoking on the factory floor. See Att. E at ¶ 8, and Att. E, Ex. 2; Att. M at ¶ 9, and Att. M, Ex. 4. As discussed above, UNICOR inmates were only permitted to smoke in a break area and even then, the break area (and smoking) was only available to inmates during two 10-minute breaks per shift. See Att. M at ¶¶ 10-11, and Att. M, Exs. 5-6. These rules were explained to all inmates when they arrived at the factory through the UNICOR McKean Familiarization Handbook. See Att. N at ¶ 8, and Att. N, Ex. 2; Att. M at ¶ 9, and Att. M, Ex. 4. There is no evidence to suggest that Defendants permitted inmates to disregard this rule and smoke in areas where it was not permitted.

Based on the foregoing, this Court finds that Plaintiff has failed to adduce sufficient

17

evidence to satisfy the subjective standard of Farmer v. Brennan, and therefore Defendants are entitled to summary judgment on his Eighth Amendment claim for this reason as well.[9] See Ward et al., 334 F.App'x at 491.

## III.  CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' motion to dismiss Plaintiff's complaint or, in the alternative, for summary judgment [Doc. # 117] be granted. The Clerk of Courts should be directed to close this case.

In accordance with Fed.R.Civ.P. 72, the parties are allowed fourteen (14) days from the date of serve to file written objection to this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. No extensions of time will be granted. Failure to file timely objections may constitute waiver of appellate rights. See Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

Dated:  June 16, 2010

cc:     The Honorable Sean J. McLaughlin
        United States District Judge

---

[9] Defendants also raise the defense of qualified immunity. Because this Court should grant summary judgment on substantive grounds, it need not address that defense.